1

2

3

4

5

6

7

8               **IN THE UNITED STATES DISTRICT COURT**

9             **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   JOHN A. FREITAS,                          No. CIV S-07-1693-CMK

12               Plaintiff,

13         vs.                                 <u>MEMORANDUM OPINION AND ORDER</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                 Defendant.
16
     _____/
17

18               Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the consent of the parties, this case is before the undersigned for final decision on

21   plaintiff's motion for summary judgment (Doc. 16) and defendant's cross-motion for summary

22   judgment (Doc. 17).

23   / / /

24   / / /

25   / / /

26   / / /

# I.  PROCEDURAL HISTORY

Plaintiff, who is a veteran, protectively applied for social security benefits on November 4, 2003.  In the application, plaintiff claims that disability began on June 7, 2003, and is caused by a combination of "stomach illness, arthritis in hips, skin, [post-traumatic stress disorder]."  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on September 20, 2006, before Administrative Law Judge ("ALJ") Sandra K. Rogers.   In a December 29, 2006, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1.  The claimant has not engaged in substantial gainful activity since June 7 2003, the alleged onset date;

2.  The claimant has the following severe impairments:  post-traumatic stress disorder; chronic polysubstance abuse, in and out of remission; fibromyalgia; and migraine headaches;

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.  Even considering the claimant's history of drug and alcohol use, the claimant has the residual functional capacity to:  lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; walk and/or stand 6 hours in an 8-hour work day; sit 6 hours in an 8-hour work day; and perform simple repetitive one or two step tasks not requiring significant close, coordinated interactions; the claimant is limited to non-hazardous work if his polysubstance use is not in remission; in all other respects, the claimant is not functionally limited;[1]

5.  The claimant is unable to perform past relevant work; and

6.  Based on the claimant's age, education, work experience, residual functional capacity, and testimony from a vocational expert, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on June 21, 2007, this appeal followed.

---

[1]  While the ALJ noted that, under Public Law 104-21, plaintiff would not be entitled to benefits if drug and/or alcohol use is a contributing factor material to a finding of disability, the ALJ concluded that, despite plaintiff's drug and alcohol use, plaintiff could work subject to a limitation to non-hazardous work if his drug and alcohol use is not in remission.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains a September 10, 2004, decision from the Department of Veterans Affairs ("VA") regarding disability benefits (CAR 78-84).  The CAR also contains the following medical records:

1.   Physical residual functional capacity assessment dated January 27, 2004, by agency consultative doctor Sandra Clancey, M.D. (Ex. 1F; CAR 18-87);

2.   Psychiatric review technique form dated February 25, 2004, by agency consultative doctor Rosemary Tyl, M.D. (Ex. 2F; CAR 190-203);

3.   Physical residual functional capacity assessment dated January 5, 2005, by agency consultative doctor Antoine Dipsia, M.D. (Ex. 4F; CAR 400-07);

4.   Psychiatric evaluation dated February 15, 2005, by agency psychiatrist Les P. Kalman, M.D. (Ex. 5F; CAR 408-11);

5.   Mental residual functional capacity assessment with psychiatric review technique form dated February 24, 2005, by agency consultative psychiatrist David E. Gross, M.D. (Exs. 6F and 7F; CAR 412-33);

6.   Psychiatric evaluation dated December 6, 2005, by agency psychiatrist Phyllis Thurstone, M.D. (Ex. 8F; CAR 433-37);

7.   Internal medicine evaluation dated December 8, 2005, by agency doctor Philip Seu, M.D. (Ex. 9F; CAR 438-41);

8.   Mental residual functional capacity assessment with psychiatric review technique form dated February 6, 2006, by agency consultative psychiatrist Lon Gottschalk, M.D. (Exs. 10F and 11F; CAR 442-59); and

9.   Records covering the periods August 2001 through December 2004, September 2005 through April 2006, and July 2006 through September 2006 from the VA (Exs. 3F, 13F, and 14F; CAR 207-399, 486-508).

Finally, the CAR contains three statements concerning plaintiff's daily activities and abilities: (1) a Daily Activities Questionnaire completed by plaintiff on December 22, 2003 (Ex. 5E; CAR 120-25); (2)  a third-party function report completed by plaintiff's friend, David Aviles, on October 20, 2005 (Ex. 12E; CAR 157-64); and (3) a function report completed by plaintiff on October 20, 2005 (Ex. 13E; CAR 163-72).

/ / /

A.    <u>**VA Disability Decision**</u>

On September 10, 2004, the VA issued a disability rating decision in response to plaintiff's appeal of an earlier decision denying a claim for service connection benefits.  The September 2004 decision also addressed plaintiff's new claim for benefits based on post-traumatic stress disorder ('PTSD").  The VA concluded that plaintiff was rated at 100% disabled due to PTSD.[2]  Regarding PTSD, the VA decision stated:

> We have established service connection for post-traumatic stress disorder as directly related to your military service, because your claimed stressors are found to be consistent with the time, place, and location of your duty in the Persian Gulf, and you have been diagnosed with post-traumatic stress disorder related to these combat stressors.  You describe artillery attacks and combat situations which are verified by your service records.  You received the Combat Infantryman's Badge for combat participation.

> At the VA examination, you reported having six different jobs since leaving the military.  You report depression, homelessness, and no close friends.  VAMC records confirm you were hospitalized, in-patient, for post-traumatic stress disorder in 2004.  You note that things are not going well with your children, you are not in a relationship, and are not currently working.  The examiner reported you have a constricted affect, with pressured speech.  You have flashbacks and intrusive thoughts.  You cannot handle crowds, have nightmares frequently, and have suicidal ideation.  Your proverb interpretation is mixed.  Your mood is dysphoric, and depressed.  You are noted to be competent to handle VA funds.  You are diagnosed with post-traumatic stress disorder and a history of alcohol abuse as secondary to PTSD.  you have been assigned a Global Assessment of Functioning (GAF) score of 33, which indicates major impairment in social and occupational functioning.

> An evaluation of 100 percent is assigned whenever there is evidence of total occupational and social impairment, due to such symptoms as:  gross impairment in thought processes or communication; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for name of close relatives, own occupation, or own name.  The examiner has reported you to be unable to work due to PTSD, you have been hospitalized due to PTSD, and you are not employed because of your disability.  You more closely approximate a 100 percent evaluation based on objective findings and current GAF score, per 38 CFR 4.7.

---

[2]    Plaintiff was also rated 10% disabled due to gastroesophageal reflux disease.

4

An evaluation of 100 percent is assigned from November 26, 2003, the date of receipt of your claim.

The assigned evaluation is not considered permanent and is subject to a future review examination.  You will be notified regarding your scheduled future examination.

Based on a 100% disability rating, plaintiff was entitled to a monthly payment of $2,239.00, beginning on December 1, 2003.

### B.   Medical Records

#### Dr. Clancey

Agency consultative doctor Clancey completed a physical residual functional capacity assessment on January 27, 2004.  She concluded that plaintiff could occasionally lift up to 50 pounds and frequently lift up to 25 pounds.  She opined that plaintiff could stand, sit, and/or walk for up to six hours in an eight-hour workday.  Dr. Clancey felt that plaintiff was unlimited in his ability to push/pull.  She found that no postural, manipulative, visual, communicative, or environmental limitations were established.  Regarding plaintiff's subjective complaints of pain, Dr. Clancey stated that the severity or duration of pain symptoms is disproportionate to the expected severity or duration suggested by the objective evidence.

#### Dr. Tyl

On February 25, 2004, agency consultative psychiatrist Tyl completed a psychiatric review technique form.  Dr. Tyl concluded that the record was insufficient to make a medical determination as to plaintiff's mental capabilities and that "[c]oexisting non-mental impairments [exist] that requires referral to another medical specialty."

#### Dr. Dipsia

Agency consultative doctor Dipsia completed a physical residual functional capacity evaluation on January 5, 2005.  Dr. Dipsia concluded that plaintiff could occasionally lift up to 20 pounds and frequently lift up to ten pounds.  In all other respects, Dr. Dipsia's assessment was the same as Dr. Clancey's January 2004 assessment.

Dr. Kalman

Agency examining psychiatrist Dr. Kalman completed a report on February 15, 2005, following his examination of plaintiff.  Plaintiff reported to Dr. Kalman that he was obtaining mental health treatment at the VA in Stockton once a week, and that he had participated in three programs at the VA in Palo Alto between February 2003 and August 2004.  Plaintiff also reported no drug and/or alcohol use.  On mental status examination, Dr. Kalman observed:

> **Attitude and Behavior**:  The patient was pleasant and cooperative.  His speech was of average rate and volume.  He had good eye contact.
>
> **Intellectual Functioning and Sensorium**:  The patient was alert and oriented as to person, place, time, and situation.  His memory was impaired as he could only recall one out of three objects after five minutes.  He had decreased attention and concentration as he was able to do four digits forward and three digits backwards.  He was able to do serial three's with no errors.  He could add, subtract, and multiply as he stated he could get 80 cents change if he bought two oranges at 10 cents each.  He was able to recall three recent presidents. His abstractions were intact, he stated that an apple and an orange "grow on trees" and a dog and cat are "animals."  He interpreted the proverb "you can't judge a book by its cover" well, stating "if you meet someone for the first time, don't judge them by what you see."  His insight into his mental illness was good and his judgment was fair.  He stated that if he found a letter in the street he would mail it and if he were the first to see fire in a theater he didn't know.
>
> **Affective Status**:  The patient's mood was depressed and irritable.  His affect was labile.  He admitted to suicidal thoughts, but has no plans or attempts.  He denied any homicidal ideation.  Neurovegetative signs included insomnia.
>
> **Thought Process/Content**:  The patient's form of thought was logical and goal directed.  There were no loose associations.  No mood swings.  No emotional lability.  He denied any auditory or visual hallucinations.  No delusions were elicited.

As to plaintiff's current functioning, Dr. Kalman noted that plaintiff was able to do his own shopping, cooking, and housekeeping on a limited basis.  Plaintiff reported he was able to maintain his own transportation, pay his bills, and take care of hygiene.  As to social functioning, Dr. Kalman noted that plaintiff is estranged from his family and has only one friend, also a veteran.  Plaintiff told Dr. Kalman that he fears being shot or "blown up" if he steps outside his

1  house.  Dr. Kalman diagnosed PTSD with major depression and assigned a GAF score of 50.  He

2  concluded that plaintiff's condition was not expected to improve within the next twelve months.

3  As to plaintiff's functional capacity, Dr. Kalman concluded:

> The patient has a decreased ability to relate and interact with supervisors
> and coworkers.  The patient is not able to deal with the public.  The patient
> is able to remember, understand, and carry out simple one or two step job
> instructions.   The patient  has a decreased ability to maintain
> concentration and attention.  The patient has a decreased ability to
> withstand the pressures and stress of daily work activities.

8  Dr. Gross

9  Agency consultative psychiatrist Dr. Gross completed a mental residual functional

10 capacity assessment with psychiatric review technique form on February 24, 2005.  Dr. Gross

11 concluded that plaintiff was moderately limited in the following areas:  (1) ability to understand

12 and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to

13 maintain attention and concentration for extended periods; (4) ability to perform activities within

14 a schedule, maintain regular attendance, and be punctual; (5) ability to sustain an ordinary routine

15 without special supervision; (6) ability to work in coordination with others without being

16 distracted; (7) ability to complete a normal workday and workweek without interruptions from

17 psychologically based symptoms; (8) ability to interact appropriately with the public; (9) ability

18 to accept instructions and respond appropriately to criticism; (10) ability to maintain socially

19 acceptable behavior and adhere to basic standards of neatness and cleanliness; (11) ability to

20 respond appropriately to changes in the work setting; and (12) ability to set realistic goals.  The

21 doctor also assessed plaintiff as moderately limited in activities of daily living, social

22 functioning, and maintaining concentration, persistence, and pace.  Overall, Dr. Gross concluded

23 that plaintiff is capable of performing simple repetitive tasks with limited contact with people.

24 / / /

25 / / /

26 / / /

7

Dr. Thurstone

Agency examining psychiatrist Dr. Thurstone reported on a December 6, 2005, mental examination.  Dr. Thurstone reported that plaintiff never leaves his house without his friend, Dave, and then only when necessary to do shopping or keep appointments.  Plaintiff wore sunglasses throughout the examination "to feel safe" and was guarded, "sitting with his back to the wall."  The doctor had "the impression that [plaintiff] has taken on a very dependent role because the VA has told him he does not have to worry about anything anymore; he is taken care of."  Plaintiff denied use of drugs, but admitted to having a beer "now and then."  On mental status examination, plaintiff could not remember five numbers forward or backwards.  He also could not remember any of three words in five minutes.  Plaintiff did not know the governor or state capital.  He could not spell the word "earth" or his own name.  As to the proverb "don't judge  a book by its cover," plaintiff stated:  "You have to read it."  As to current level of functioning, Dr. Thurstone reported:

> Activities of Daily Living:  The claimant lives in an apartment alone, apparently estranged from his family and any of his friends, except the one friend, Dave.  He never goes out alone.  If he needs shopping or appointments Dave will go with him.  Dave is also a veteran.
>
> Social Functioning:  The claimant has no social functioning at all now.  At all times he tries to avoid being around people.
>
> Concentration, Persistence, and Pace:  Very poor in the examination.  It would seem as though the claimant's thoughts were elsewhere.

Dr. Thurstone diagnosed PTSD and a depressive order, not otherwise specified.  She assigned a GAF score of 45.  Dr. Thurstone provided the following functional assessment:

> The claimant is probably not able to manage his own funds and probably should have a payee.  He did calculations very poorly.
>
> The claimant could barely do the simplest of tasks in the examination.  Cooperation was very poor.  Concentration was poor.
>
> The claimant socially isolates and cannot work with others.  He is able to drive.

It would seem very difficult for this man to handle the usual stresses of the competitive work world due to his psychiatric condition.

Dr. Seu

Agency examining doctor Seu reported on a December 8, 2005, internal medicine examination.  The doctor reported plaintiff's present physical ailments as neck and low back pain and hip problems.  Plaintiff reported to Dr. Seu that he lives alone and is able to prepare his own meals and shop for himself.  Dr. Seu stated:  "The claimant has numerous somatic complaints today but I was unable to verify any specific disorder based on my examination today."  Dr. Seu also stated that he was unable to define any limitations to plaintiff's physical capabilities.

Dr. Gottschalk

Agency examining psychiatrist Dr. Gottschalk completed a mental residual functional capacity assessment with psychiatric review technique form on February 6, 2006.  He opined that plaintiff was moderately limited in the following areas:  (1) ability to carry out detailed instructions; (2) ability to maintain attention and concentration for extended periods; (3) ability to work in coordination with others without being distracted; (4) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; (5) ability to interact appropriately with the public; (6) ability to accept instructions and respond appropriately to criticism; (7) ability to get along with co-workers; (8) ability to respond appropriately to changes in the work setting; (9) ability to travel in unfamiliar places or use public transportation; and (10) ability to be aware of normal hazards and take appropriate precautions.  As to the last area, the doctor noted that, if plaintiff were sober, he would not be significantly limited.  Dr. Gottschalk opined that plaintiff was mildly limited in activities of daily living, but moderately limited in social functioning, and maintaining concentration, persistence, and pace.   Dr. Gottschalk concluded that plaintiff could perform simple tasks not requiring close coordinated interactions.

/ / /

1    VA Records

2            Plaintiff's VA medical records are extensive, covering periods from August 2001,

3    through September 2006.  As discussed below, however, plaintiff only refers specifically to one

4    page of these records – a March 5, 2004, note by clinical social worker Judith O. Moltzen,

5    M.S.W.[3]  This note was prepared following plaintiff's admission to the VA hospital in February

6    2004.  In the note, Ms. Moltzen states:

> Mr. Freitas was referred by 5B3.  He is a Persian Gulf War Vet, no
> previous PTSD treatment and does not have a history of drug/alco abuse
> (from veteran's self report).  He joined the Army at age 23, was sent to
> Germany for 3 years and then in Jan '91 to the Persian Gulf.  While in the
> Gulf he stated that he was always frightened and didn't expect to come
> home.  He witnesses the enemy, who would not surrender, being shot and
> stated that he was around dead and burned bodies "I can't get the smell of
> bodies out of my head."  When he came home he said that he was angry,
> mad, didn't like taking orders, had trouble being around people, and was
> nervous all the time.  His symptoms have exacerbated since the start of the
> current war with Iraq.  His mother is deceased and he is not talking with
> his father "I don't want anything to do with him anymore."  He stated that
> his father was very strict, opinionated, and demanding while he was
> growing up.  "I had to do everything right and excel in sports."  He was
> diagnosed with ADD as a child and was on medication until 6th grade, he
> started using marijuana in 9th grade and dropped out of school in the 11th
> grade, he was kicked out of the house because he quit school and lived in
> his truck.
>
> Mr. Freitas has two children from two different women and is responsible
> for child support.  He stated that he has back child support payments and
> does not know where he stands legally on this matter.  I told him that this
> needed to be cleared up before we would consider him for admission.  He
> understood this and said he would call CFF today or Monday to find out
> what his options are at this time.  He also said he was having an interview
> at New Horizons.  If Mr. Freitas does not have any legal issues pending
> and completing New Horizon progress we would accept him pending
> medical clearance.  In addition, we discussed the HVRF Program and he
> stated that he felt he would like to go there after he completes our
> program.

Ms. Moltzen did not report any objective findings or render any opinions.

/ / /

/ / /

_____

[3]        Plaintiff refers to Ms. Moltzen as "Molteen" and "Morteen."

C.      **First-Party and Third-Party Statements**

Plaintiff's Statements

In the December 22, 2003, daily activities questionnaire, plaintiff stated the following with respect to his mental impairment:

1.      He spends most of his time in bed;

2.      He has nightmares;

3.      His friend does his laundry, cooking, and cleaning for him (although later in the questionnaire plaintiff states that he does "some cleaning and laundry when I can get out of bed");

4.      He does not do any shopping (although later in the questionnaire plaintiff states that he goes to the grocery store);

5.      He watches television "all the time" and can remember what he watches;

6.      He does not have any difficulties getting along with family, friends, co-workers, or others;

7.      He is "sick all the time"; and

8.      He has no problems concentrating.

Plaintiff also submitted a function report on October 20, 2005, in which he stated:

1.      Since the onset of disability, he cannot be around people;

2.      He works at Delta Humane Society feeding animals;

3.      He has nightmares every night and can only sleep a few hours at a time;

4.      He has difficulty dressing, feeding himself, and shaving;

5.      He needs reminders to take his medication;

6.      He does not do many household chores because he can't finish them due to pain and difficulty concentrating;

7.      He can pay his bills and handle a savings account, but cannot count change or use a checkbook;

8.      He plays golf;

9.      He does not leave the house except to attend doctor appointment;

10.     He does not like being around people;

1        11.       He cannot finish what he starts;

2        12.       He cannot follow written or spoken instructions;

3        13.       He cannot get along with authority figures; and

4        14.       He cannot handle stress or changes in routine.

5        <u>Mr. Aviles' Statement</u>

6        Plaintiff's friend, David Aviles, submitted a third-party function report on October

7 20, 2005.  Mr. Aviles stated:

8        1.       Plaintiff sometimes helps feed animals at the Delta Humane Society;

9        2.       Plaintiff experiences night terrors, cold sweats, and insomnia;

10       3.       Due to medication, plaintiff is confused and disoriented;

11       4.       Plaintiff can only do limited cleaning, which takes him all day due to "starts and stops";

12

13       5.       Plaintiff sometimes goes outside the house, can drive, and can go out alone;

14       6.       Plaintiff can pay his bills and handle a savings account, but cannot count change or use a checkbook;

15

16       7.       Plaintiff "needs guidance for determining priorities";

17       8.       Plaintiff plays golf once a month;

18       9.       Plaintiff has difficulty following written and spoken instructions; and

19       10.       Plaintiff has difficulty handling stress and changes in routine.

20

21        **III.  STANDARD OF REVIEW**

22        The court reviews the Commissioner's final decision to determine whether it is:

23 (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

24 whole.  <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

25 more than a mere scintilla, but less than a preponderance.  <u>See</u> <u>Saelee v. Chater</u>, 94 F.3d 520, 521

26 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

1   support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971).  The record as a whole,

2   including both the evidence that supports and detracts from the Commissioner's conclusion, must

3   be considered and weighed.  <u>See</u> <u>Howard v. Heckler</u>, 782 F.2d 1484, 1487 (9th Cir. 1986); <u>Jones</u>

4   <u>v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

5   decision simply by isolating a specific quantum of supporting evidence.  <u>See</u> <u>Hammock v.</u>

6   <u>Bowen</u>, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

7   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

8   Commissioner is conclusive.  <u>See</u> <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

9   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

10  which supports the Commissioner's decision, the decision must be affirmed, <u>see</u> <u>Thomas v.</u>

11  <u>Barnhart</u>, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

12  standard was applied, <u>see</u> <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1338 (9th Cir. 1988).

13

14                                    **IV.  DISCUSSION**

15          In his motion for summary judgment, plaintiff argues that this case should be

16  remanded for an immediate award of benefits because:  (1) the ALJ failed to mention or consider

17  the Department of Veterans Affairs disability decision; (2) the ALJ failed to consider the record

18  as a whole in determining plaintiff's residual functional capacity; (3) the ALJ improperly rejected

19  plaintiff's testimony as not credible; and (4) the hypothetical questions posed to the vocational

20  expert did not reflect all of plaintiff's limitations.  As discussed in detail below, all of plaintiff's

21  arguments concern the ALJ's analysis of his mental impairment.

22      **A.      <u>Consideration of Department of Veterans Affairs Decision</u>**

23          Plaintiff argues that, under <u>McCartey v. Massanari</u>, 298 F.3d 1072 (9th Cir. 2002),

24  the ALJ must generally give significant weight to any disability determination by the Department

25  of Veterans Affairs when deciding whether a veteran is entitled to social security benefits.

26  According to plaintiff, the ALJ in this case failed to even mention, let alone credit, the September

1   2004 Department of Veterans Affairs disability decision, which rated plaintiff 100% disabled due

2   to PTSD.  Plaintiff concludes that this omission constitutes reversible error.

3       In <u>McCartey</u>, the Ninth Circuit outlined the following factual background:

4        McCartey's disability stems from a workplace accident in 1987, in
    which a 100 pound door fell on him and injured his lower back.  Although

5       McCartey returned to work after the accident, by 1991 his lower back pain
    had grown so intense that he could no longer work.  Around that time,

6       McCartey's previously extant depression worsened considerably, and he
    began to suffer from a host of other ailments. (footnote omitted).  On June

7       3, 1997, the VA granted McCartey a nonservice-connected pension after
    finding that he was "unable to secure and follow a substantially gainful

8       occupation" due to disability.  The VA gave McCartey a total disability
    rating of 80% based primarily on his depression and secondarily on his

9       lower back injury.

10      <u>Id.</u> at 1073.

11  The ALJ's decision in McCartey's case contained no reference to the VA disability rating.

12  <u>See</u> <u>id.</u> at 1075.  In a case of first impression, the Ninth Circuit addressed whether a VA disability

13  rating is entitled to evidentiary weight in a social security case.  Concluding that it is, the court

14  noted that the nine other circuit courts to address the question reached the same result.  <u>See</u> <u>id.</u> at

15  1075 (citations omitted).  The court held:

16       We agree with all of the other circuits that have considered the
    question and hold that, although a VA rating of disability does not

17      necessarily compel the SSA to reach an identical result, 20 C.F.R.
    § 404.1504, the ALJ must consider the VA's finding in reaching his

18      decision.

19      <u>Id.</u> at 1076.

20      Having concluded that the ALJ must consider a VA disability rating, the court in

21  <u>McCartey</u> next addressed the weight to be given a VA disability determination.  The court

22  adopted the approach of the Fourth, Fifth, and Eleventh Circuits and held that the ALJ must

23  "ordinarily give great weight to a VA determination of disability."  <u>Id.</u> (citations omitted).  The

24  court reached this conclusion because of the similarity between the social security and VA

25  disability programs, which both evaluate a claimant's ability to perform full-time work which

26  exists in the national economy, both have detailed regulatory schemes, and both require

1  documentation in support of claims.  See id.  However, because the programs are not identical,

2  the court stated that "the ALJ may give less weight to a VA disability rating if he gives

3  persuasive, specific, valid reasons for doing so that are supported by the record."  Id.  The court

4  concluded that, because the ALJ failed to consider McCartey's VA disability rating and did not

5  even mention it in his decision, a remand was required.  See id.  The court remanded for

6  immediate payment of benefits because the record was developed and, based on the VA's

7  disability rating, the plaintiff was also entitled to social security benefits.  See id. at 1077.

8           In this case, the ALJ noted that plaintiff "has suffered from PTSD following his

9  military service in the Gulf War, for which he has received treatment from the Veteran's

10  Administration" and stated:

11                . . . I have taken notice of the fact that the Department of Veterans Affairs
                determined that Claimant was entitled to benefits.  See Exhibit D.
12                However, the rules for that determination are different than the Social
                Security Administration's rules.  While I recognize that his PTSD is
13                significant and there was an acute period of about six months in 2004, it
                does not prevent him from performing simple, one and two step jobs.  The
14                Claimant also admittedly continues to use marijuana and alcohol to excess,
                which is likely the source of much of his current difficulties, especially
15                when added to his medications and PTSD symptoms.  Similarly, while his
                physical condition is less than it was before, he is still capable of light
16                work.  His own statements indicate that he participates in business, plays
                golf, goes fishing, and participates in several social organizations, keeping
17                him busy.  He also stated he was planning a trip to Australia.  Exhibit 14F,
                p. 5.  Here, I find that the Claimant is capable of a range of unskilled,
18                simple repetitive light work, with the limitations set forth above.

19  There is no other mention of the VA's disability decision.

20           Defendant argues that this discussion satisfies McCartey:

21                Here, the ALJ provided persuasive, specific, and valid reasons for
            declining to adopt the VA's disability determination (Tr. 22).  Specifically,
22            she discussed that there are different rules for determining disability under
            SSA as under the VA; that the totality of the evidence showed that
23            Plaintiff could still perform light work that required simple one and two
            step jobs even with his PTSD (see infra at 8-14); and that Plaintiff has
24            engaged in a wide variety of activities, including participating in
            businesses, social organizations, and hobbies such as golf and fishing (Tr.
25            22).  As such, the ALJ properly provided sufficient reasons to explain her
            decision to decline to adopt the VA's determination.

26

The court agrees with defendant.  This case is not like McCartey, in which the ALJ made no mention of the VA disability determination whatsoever.  Here, the ALJ noted the VA decision, and declined to adopt it.  The ALJ noted, as did the court in McCartey, that the VA and social security rules are different.  Under McCartey, this difference permits the ALJ to afford the VA decision less weight provided the ALJ sets forth "persuasive, specific, valid reasons for doing so that are supported by the record."  298 F.3d at 1076.  As defendant notes, the ALJ in this case declined to follow the VA determination because the medical records and plaintiff's daily activities showed that plaintiff could still perform light work.  The court finds that this analysis satisfies McCartey.[4]

## B.    **Residual Functional Capacity Finding**

Residual functional capacity is what a person "can still do despite [the individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").  Thus, residual functional capacity describes a person's exertional capabilities in light of his or her limitations.[5]  Where there is a colorable claim of mental impairment, the regulations require the ALJ to follow a special procedure.  See 20 C.F.R.

---

[4]    Whether the ALJ's analysis is supported by substantial evidence is discussed in the context of plaintiff's arguments relating to the ALJ's residual functional capacity assessment and credibility finding.

[5]    Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20 C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§ 404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§ 404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§ 404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  See 20 C.F.R. §§ 404.1567(e) and 416.967(e).

1   §§ 404.1520a(a), 416.920a(a).  The ALJ is required to record pertinent findings and rate the

2   degree of functional loss.  See 20 C.F.R. §§ 404.1520a(b), 416.920a(b).

3          Plaintiff contends that he is disabled due to non-exertional limitations relating to

4   his PTSD.[6]  Specifically, plaintiff  argues that the ALJ failed to properly credit the conclusions of

5   agency consultative psychiatrists Drs. Gross and Gottschalk and agency examining psychiatrists

6   Drs. Kalman and Thurstone.  Plaintiff also asserts that the ALJ failed to give any consideration to

7   a report from a therapist at the VA, Judith O. Moltzen, M.S.W.  Plaintiff concludes that, had the

8   ALJ property considered these opinions, she would have reached a very different assessment of

9   the functional limitations caused by plaintiff's PTSD.

10          1.   Agency Doctors' Opinions

11          The weight given to medical opinions depends in part on whether they are

12   proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

13   821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

14   professional, who has a greater opportunity to know and observe the patient as an individual,

15   than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

16   (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

17   to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

18   (9th Cir. 1990).

19          In addition to considering its source, to evaluate whether the Commissioner

20   properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

21   in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

22   uncontradicted opinion of a treating or examining medical professional only for "clear and

23   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

24   While a treating professional's opinion generally is accorded superior weight, if it is contradicted

25

26          [6]        He does not challenge the ALJ's findings with respect to exertional capabilities.

by an examining professional's opinion which is supported by different independent clinical

findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

without other evidence, is insufficient to reject the opinion of a treating or examining

professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

see also Magallanes, 881 F.2d at 751.

        As indicated above, plaintiff challenges the ALJ's assessments of the opinions of

the four agency psychiatrists who either examined plaintiff or reviewed records – Drs. Kalman,

Thurstone, Gross, and Gottschalk.  As to Drs. Kalman and Thurstone, who conducted

comprehensive psychiatric examinations and submitted reports, the ALJ stated:

> The Claimant was examined by two different psychological consultative
> examiners.  First, (Exhibit 5F) in February 2005, Dr. Kalman noted the
> Claimant reported he had no drug or alcohol history.  The Claimant's
> mood was depressed and irritable and his affect was labile.  He was not
> delusional.  Dr. Kalman noted the history of combat in the Gulf War and
> the Claimant's reports of nightmares, flashbacks, hypervigilence, startle,
> avoidance, and depression.  Dr. Kalman diagnosed PTSD and a major
> depressive disorder, and assessed a GAF of 50.  He noted that the
> Claimant had a decreased ability to relate to and interact with supervisors
> and coworkers, was not able to deal with the public, had a decreased
> ability to maintain concentration and attention, and a decreased ability to
> withstand the pressures and stress of daily work activities, but was able to
> remember, understand, and carry out simple one or two step job
> instructions.

1
2
3
4
5

The second psychological consultative examination was performed by psychiatrist Dr. Thurstone in December 2005. Exhibit 8F, p. 4. The Claimant was reported to be fairly hypervigilent, sat with his back to a wall, and wore sunglasses indoors. He reported depressive feelings. He also denied the use of substances and that he only has a beer "now and then." While Dr. Thurstone noted that the Claimant's concentration, persistent, and pace were very poor, she also noted that his cooperation was very poor. Dr. Thurstone concluded that the Claimant was not able to manage his own funds, could barely do the simplest of tasks, and could not work with others.

6
7
8
9
10

It is very troubling that in both of these examinations, the Claimant was not candid about his substance abuse problem. It is likely the examiners' observations and conclusions would have been very different had they known. As it is, they did not assess the effects of the substance abuse on the Claimant's activities of daily life, his ability to interact with others, or his ability to concentrate and maintain pace in his work. It is clear from the Claimant's recent medical records that he continues to abuse both marijuana and alcohol and it is likely the use of these substances interferes with his mental functional abilities.

11
12

Dr. Thurstone noted that the Claimant's cooperation was very poor and I must therefor reject her conclusion. . . .

13   The ALJ accepted Dr. Kalman's assessment but rejected that of Dr. Thurstone. As to Drs. Gross

14   and Gottschalk – who provided assessments based on their review of plaintiff's records – the

15   ALJ did not provide any specific analysis other than to say that she considered their assessments.

16   However, the ALJ did not reject the doctors' assessments, which largely agreed that plaintiff was

17   moderately limited in various categories and not severely limited in any category.

18          Plaintiff contends:

19   The ALJ failed to offer the requisite "clear and convincing" reasons for disregarding the uncontradicted opinion on an examining professional. Even if these opinions were contradicted, it was necessary for the ALJ to provide "specific and legitimate" reasons for rejecting their opinion. The ALJ's decision does not come close to satisfying the requirements under the law of this Circuit.
20
21

22   Instead, the ALJ justified her rejection of the consultative examiners' opinions by noting, "[T]he Claimant was not candid about his substance abuse problem. It is likely the examiners' observations and conclusions would have been very different had they known."
23

24

25   Contrary to plaintiff's assertion, however, the ALJ's decision fails to support this argument.

26   First, the ALJ did not reject Dr. Kalman's assessment, which she incorporated into her residual

1   functional capacity determination.  Second, while the ALJ mentioned plaintiff's lack of candor

2   regarding his drug and alcohol use, she did not reject any opinion for this reason.  She merely

3   noted that the lack of candor was "troubling."  Instead, the ALJ rejected Dr. Thurstone's opinion

4   because plaintiff's cooperation was poor, a point which plaintiff neglects to mention in his brief.

5   The court finds that this is a sufficient reason to reject Dr. Thurstone's conclusions in favor of

6   Dr. Kalman's conclusions.

7               With respect to the agency consultative doctors – Drs. Gross and Gottschalk –

8   plaintiff argues that the ALJ's decision did not account for the moderate limitations the doctors

9   noted which, according to plaintiff, "parallel the findings and conclusions from the [agency]

10  consultative examiners [Drs. Kalman and Thurstone]."  The court is not quite sure what to make

11  of this argument given that, on the one hand he says the opinions of Drs. Gross and Gottschalk

12  are the same as the opinion expressed by Dr. Kalman – which the ALJ accepted – but on the

13  other hand argues that the ALJ improperly rejected the opinions of Drs. Gross and Gottschalk.

14  This seems contradictory.  If the opinions of Drs. Gross, Gottschalk, and Kalman are the same,

15  and if the ALJ accepted the opinion of Dr. Kalman, it is axiomatic that she also accepted the

16  opinions of Drs. Gross and Gottschalk.

17              Finally, plaintiff also argues that the ALJ erred by not including all of the

18  moderate limitations found by Drs. Gross and Gottschalk in her residual functional capacity

19  finding.[7]  Drs. Gross and Gottschalk concluded that plaintiff could perform simple repetitive

20  tasks involving limited contact and/or close coordinated interactions.  Similarly, Dr. Kalman

21  concluded that plaintiff was able to remember, understand, and carry out simple one or two step

22  job instructions, but was limited in his ability to relate to and interact with supervisors and

23  coworkers, deal with the public, maintain concentration and attention, and withstand the

24

25         [7]      To the extent plaintiff argues that the ALJ erred by not specifying all moderate
    limitations in hypothetical questions posed to the vocational expert, that issue is addressed
26  below.

1  pressures and stress of daily work activities.  While the ALJ adopted the ultimate functional

2  capacity assessments rendered by Drs. Kalman, Gross, and Gottschalk that plaintiff was limited

3  to performing only simple repetitive one or two step tasks not requiring significant close,

4  coordinated interactions, her residual functional capacity findings makes no mention of other

5  moderate limitations assessed by the agency doctors.

6        As reflected by the hypothetical questions posed to the vocational expert, the

7  ALJ's residual functional capacity assessment assumes that plaintiff is "able to adapt to changes

8  in work environment."[8]  However, Dr. Kalman concluded that plaintiff was limited in his ability

9  to withstand work pressures.  Similarly, Drs. Gross and Gottschalk concluded that plaintiff was

10  moderately limited in his ability to respond appropriately to changes in the work setting.  Even

11  though the ALJ accepted Dr. Kalman's assessment, the decision contains no explanation as to

12  why this limitation was not included.

13        Additionally, the ALJ did not include other limitations found by Drs. Kalman,

14  Gross, and Gottschalk.  Specifically, Drs. Gross and Gottschalk agreed that plaintiff is

15  moderately limited in his ability to complete a normal workday and workweek without

16  interruptions from psychologically based symptoms and ability to accept instructions and respond

17  appropriately to criticism.  In addition, all three doctors agreed that plaintiff could not maintain

18  attention and concentration for extended periods.  Again, even though the ALJ accepted the

19  assessments rendered by Drs. Kalman, Gross, and Gottschalk, the ALJ did not include any of

20  these limitations in her residual functional capacity finding.

21        For these reasons, the court finds that the ALJ erred by not including the four

22  specific limitations discussed above in her residual functional capacity finding.

23  / / /

24

25        [8]      In her residual functional capacity finding, the ALJ stated that plaintiff can
    "perform simple repetitive one or two step tasks not requiring significant close, coordinated
    interactions; the claimant is limited to non-hazardous work if his polysubstance use is not in
26  remission; in all other respects, the claimant is not functionally limited."

1          2.      Ms. Moltzen's Report

2          Because Ms. Moltzen is a social worker and, therefore, not a medical professional

3   under the regulations, see 20 C.F.R. § 404.1513(a), she is considered a lay witness.  In

4   determining whether a claimant is disabled, an ALJ generally must consider lay witness

5   testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915, 919 (9th

6   Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay testimony as to

7   a claimant's symptoms or how an impairment affects ability to work is competent evidence . . .

8   and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100 F.3d 1462,

9   1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony of lay

10  witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at 919.

11         The ALJ, however, need not discuss all evidence presented.  See Vincent on

12  Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

13  why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700,

14  706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored evidence

15  which was neither significant nor probative.  See id. at 1395.  As to a letter from a treating

16  psychiatrist, the court reasoned that, because the ALJ must explain why he rejected

17  uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was

18  controverted by other medical evidence considered in the decision.  See id.  As to lay witness

19  testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

20  concluded that the evidence was properly ignored because it "conflicted with the available

21  medical evidence" assessing the plaintiff's mental capacity.  Id.

22         In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent

23  disregard of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay witness

24  had testified about the plaintiff's "inability to deal with the demands of work" due to alleged

25  back pain and mental impairments.  Id.  The witnesses, who were former co-workers testified

26  about the plaintiff's frustration with simple tasks and uncommon need for supervision.  See id.

1   Noting that the lay witness testimony in question was "consistent with medical evidence," the

2   court in Stout concluded that the "ALJ was required to consider and comment upon the

3   uncontradicted lay testimony, as it concerned how Stout's impairments impacted his ability to

4   work." Id. at 1053.   The Commissioner conceded that the ALJ's silent disregard of the lay

5   testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth

6   Circuit rejected the Commissioner's request that the error be disregarded as harmless.  See id. at

7   1054-55.  The court concluded:

8           Because the ALJ failed to provide any reasons for rejecting competent lay
            testimony, and because we conclude that error was not harmless,
9           substantial evidence does not support the Commissioner's decision . . .

10          Id. at 1056-67.

11          From this case law, the court concludes that the rule for lay witness testimony

12  depends on whether the testimony in question is controverted or consistent with the medical

13  evidence.  If it is controverted, then the ALJ does not err by ignoring it.  See Vincent, 739 F.2d at

14  1395.  If lay witness testimony is consistent with the medical evidence, then the ALJ must

15  consider and comment upon it.  See Stout, 454 F.3d at 1053.  However, the Commissioner's

16  regulations require the ALJ consider lay witness testimony in certain types of cases.  See Smolen

17  v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13.  That ruling requires the ALJ to

18  consider third-party lay witness evidence where the plaintiff alleges pain or other symptoms that

19  are not shown by the medical evidence.  See id.  Thus, in cases where the plaintiff alleges

20  impairments, such as chronic fatigue or pain (which by their very nature do not always produce

21  clinical medical evidence), it is impossible for the court to conclude that lay witness evidence

22  concerning the plaintiff's abilities is necessarily controverted such that it may be properly

23  ignored.  Therefore, in these types of cases, the ALJ is required by the regulations and case law to

24  consider lay witness evidence.

25  / / /

26  / / /

1    Plaintiff argues that Ms. Moltzen's March 2004 chart note is "consistent with the

2  VA records" and that "[i]t was error for the ALJ to ignore Ms. Molteen's [sic] opinion." This

3  argument is unpersuasive.  First, plaintiff's argument is factually flawed because Ms. Moltzen

4  did not offer any professional opinion or assessment.  Therefore, it cannot be said that the ALJ

5  ignored Ms. Moltzen's opinion.  Second, it is clear that the ALJ considered Ms. Moltzen's March

6  2004 chart note.  Specifically, the ALJ's decision references Exhibit 3F, pp. 15-160 – which

7  contains the chart note at page 150 – in describing plaintiff's VA records.  Third, it appears that

8  Ms. Moltzen's chart note is contradicted by other VA records and, for this reason, the ALJ

9  properly ignored it because it was neither significant nor probative.  One contradiction is that Ms.

10  Moltzen stated that plaintiff had no history of drug or alcohol abuse.  However, she also states

11  that plaintiff started using marijuana in the ninth grade.  Further, in October 2003, plaintiff

12  admitted to fairly heavy alcohol use (four to five beers a day two or three times per week).

13  See Ex. 3F; CAR 389.

14    Finally, even if the ALJ did err by not specifically discussing Ms. Moltzen's two-

15  paragraph chart note, any error was harmless.  The Ninth Circuit has applied harmless error

16  analysis in social security cases in a number of contexts.  For example, in Stout v. Commissioner

17  of Social Security, 454 F.3d 1050 (9th Cir. 2006), the court stated that the ALJ's failure to

18  consider uncontradicted lay witness testimony could only be considered harmless ". . . if no

19  reasonable ALJ, when fully crediting the testimony, could have reached a different disability

20  determination."  Id. at 1056; see also Robbins v. Social Security Administration, 466 F.3d 880,

21  885 (9th Cir. 2006) (citing Stout, 454 F.3d at 1056).  Similarly, in Batson v. Commissioner of

22  Social Security, 359 F.3d 1190 (9th Cir. 2004), the court applied harmless error analysis to the

23  ALJ's failure to properly credit the claimant's testimony.  Specifically, the court held:

24         However, in light of all the other reasons given by the ALJ for
           Batson's lack of credibility and his residual functional capacity, and in
25         light of the objective medical evidence on which the ALJ relied there was
           substantial evidence supporting the ALJ's decision.  Any error the ALJ
26         may have committed in assuming that Batson was sitting while watching

television, to the extent that this bore on an assessment of ability to work, was in our view harmless and does not negate the validity of the ALJ's ultimate conclusion that Batson's testimony was not credible.

Id. at 1197 (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)). In Curry, the Ninth Circuit applied the harmless error rule to the ALJ's error with respect to the claimant's age and education.

The harmless error standard was recently applied in Carmickle v. Commissioner, 533 F.3d 1155 (9th Cir. 2008), to the ALJ's analysis of a claimant's credibility.  Citing Batson, the court stated:  "Because we conclude that . . . the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error."  See id. at 1162.  The court articulated the difference between harmless error standards set forth in Stout and Batson as follows:

> . . . [T]he relevant inquiry [under the Batson standard] is not whether the ALJ would have made a different decision absent any error. . . it is whether the ALJ's decision remains legally valid, despite such error. In Batson, we concluded that the ALJ erred in relying on one of several reasons in support of an adverse credibility determination, but that such error did not affect the ALJ's decision, and therefore was harmless, because the ALJ's remaining reasons *and ultimate credibility determination* were adequately supported by substantial evidence in the record.  We never considered what the ALJ would do if directed to reassess credibility on remand – we focused on whether the error impacted the *validity* of the ALJ's decision.  Likewise, in Stout, after surveying our precedent applying harmless error on social security cases, we concluded that "in each case, the ALJ's error . . . was inconsequential to the *ultimate nondisability determination.*"

> Our specific holding in Stout does require the court to consider whether the ALJ would have made a different decision, but significantly, in that case the ALJ failed to provide *any reasons* for rejecting the evidence at issue.  There was simply nothing in the record for the court to review to determine whether the ALJ's decision was adequately supported.

> Carmickle, 533 F.3d at 1162-63 (emphasis in original; citations omitted).

Thus, where the ALJ's errs in not providing any reasons supporting a particular determination, the error is only harmless if the ultimate disability conclusion is invalid because a reasonable ALJ would have reached a different conclusion had the error not occurred.  Otherwise, an ALJ's

1  error is harmless if it is inconsequential to the ultimate conclusion regarding disability.

2          In this case, if the ALJ's silence regarding Ms. Moltzen's March 2004 chart note

3  can be seen as an improper rejection of anything Ms. Moltzen said, it cannot be said that any

4  reasonable ALJ would have reached a different disability conclusion had Ms. Moltzen's

5  statement been considered.  As discussed above, Ms. Motzen did not offer any opinion or record

6  any objective findings.  Rather, she merely recited plaintiff's history and subjective complaints.

7      **C.**      **Plaintiff's Credibility**

8          The Commissioner determines whether a disability applicant is credible, and the

9  court defers to the Commissioner's discretion if the Commissioner used the proper process and

10  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

11  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

12  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

13  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

14  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

15  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

16  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

17  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

18  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

19          If there is objective medical evidence of an underlying impairment, the

20  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

21  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

22  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

23                  The claimant need not produce objective medical evidence of the
                [symptom] itself, or the severity thereof.  Nor must the claimant produce
24              objective medical evidence of the causal relationship between the
                medically determinable impairment and the symptom.  By requiring that
25              the medical impairment "could reasonably be expected to produce" pain or
                another symptom, the Cotton test requires only that the causal relationship
26              be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

As to plaintiff's credibility, the ALJ stated:

> After considering the evidence of record, I find that the Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible to the extent that those statements constitute an allegation the Claimant has been precluded from engaging in all substantial gainful activity by a medically determinable impairment or impairments for a period of time which has lasted or can reasonable be expected to last for 12 continuous months.

The ALJ stated that the medical evidence was the "first and primary factor" considered in reaching her credibility finding and added:

> In September 2005, the Claimant was seen at the [VA] general medicine clinic.  It was noted that he had marijuana dependence, continuous, alcohol abuse in remission, . . . chronic PTSD, a depressive disorder NOS. . . . Exhibit 13F, p. 6.  The next recorded follow-up appointment was April 14, 2006, at which time there was no change in his diagnoses or medications.

27

Exhibit 13F, p. 2. . . .  In August 2006, the Claimant was seen in a follow-up appointment, during which he stated that he was "active in multiple small businesses that other people run.  His partner [David Aviles] is another veteran he went through the PTSD National Center with."  Exhibit 14F, p. 12.  It was noted he had chronic alcohol and marijuana use.  Exhibit 14F, p. 10.  His GAF score was assessed at 50.  Exhibit 14F, p. 6.  The Claimant attended a PTSD support group meeting on September 25, 2006.  Exhibit 14F, p. 6.  The Claimant reported that fishing, golfing, and participation in several social organizations was keeping him busy and he was planning a trip to Australia.  He also reported continuing feelings of depression and easily triggered anger.  Exhibit 14F, p. 5.  On September 26, 2006, the Claimant reported he was using marijuana about 4 times per week and continuing to drink alcohol.  Exhibit 14, p. 2.

\* \* \*

The Claimant's service to the county is admirable and greatly appreciated.  However, he has not met his burden to provide objective evidence to support his claims to obtain disability benefits. . . .  While I recognize that his PTSD is significant and there was an acute period of about six months in 2004, it does not prevent him from performing simple, one and two step jobs.  The Claimant also admittedly continues to use marijuana and alcohol to excess, which is likely the source of much of his current difficulties, especially when added to his medications and PTSD symptoms.  Similarly, while his physical condition is less than it was before, he is still capable of light work.  His own statements indicate that he participates in businesses, plays golf, goes fishing, and participates in several social organizations, keeping him busy.  He also stated he was planning a trip to Australia.  Exhibit 14F, p. 5.  Here, I find that the Claimant is capable of a range of unskilled, simple repetitive light work, with the limitations set forth above.

Plaintiff argues this analysis is insufficient.  Specifically, plaintiff asserts:

. . .The only semblance of meeting this requirement [of setting forth specific findings to permit the court to determine whether the ALJ's conclusion was arbitrary] was the ALJ's passing reference to Freitas' social activities.  However, the ALJ's characterization of these activities is entirely imprecise.  For example, the ALJ writes, "his own statements indicate that he participates in business, plays golf, goes fishing, and participates in several social organizations, keeping him busy.  He also stated he was planning a trip to Australia."  The ALJ speculates that Freitas is capable of performing these activities without difficulty.  Not so.  In fact, the VA records provide an account of Freitas' participation in activities:

Depression, still taking up on days wanting to do nothing.  Anger is easily triggered more frequently.  Gave an example of golfing experience last week where he lost it to the extent that he was ready to go home.

28

1
2
3
4
5
6
7

> There is no indication that Freitas' activities are by any means significant or that he can engage in these activities without difficulty. When specifically asked about hobbies . . ., Freitas reports that his hobbies consist of watching television. He adds, "I am sick all the time so I have no social activities." However, even if Freitas was engaging in some activities, such as golf, courts have recognized that disability claimant's should not be penalized for attempting to lead normal lives in the fact of their limitations. Only if the level of activity were inconsistent with a claimant's claimed limitations would these activities have any bearing on a claimant's credibility. There is no evidence that Freitas' level of activity is inconsistent with his alleged limitations. Therefore, the ALJ's credibility finding is flawed in that she failed to identify what testimony is not credible and what evidence undermines Freitas' complaints.

8    The court agrees that the record tends to show that plaintiff participated in various

9  activities with difficulty and only with assistance. For example, as to his work at the Delta

10  Humane Society, both plaintiff and Mr. Aviles stated that he does that work only with assistance.

11  Further, plaintiff accurately cites VA records reflecting that, at least on one occasion, he "lost it"

12  while playing golf. Also, planning a trip to Australia is not inconsistent with plaintiff's stated

13  limitations. There is no indication whether this "planning" went beyond simply thinking about

14  such a trip, or that he ever actually went on the trip. The first-party and third-party statements are

15  also consistent with respect to plaintiff's claimed limited ability to cook, clean, shop, handle

16  finances, and otherwise engage in daily activities.

17    While the ALJ may have overstated plaintiff's participation in specific activities,

18  the court nonetheless finds that the adverse credibility finding is based on sufficient explanation

19  and supported by substantial evidence. First, plaintiff states that participation in various

20  activities was "keeping his busy." Even though plaintiff may have had difficulty doing these

21  activities, the ALJ was entitled to conclude that the general level of activity – such as would keep

22  plaintiff busy – was inconsistent with his stated limitations. Second, plaintiff was uncooperative

23  and failed to give full effort during various examinations. Specifically, Dr. Thurstone reported

24  that plaintiff's cooperation was poor, and Dr. Seu stated that he could not be confident that his

25  testing reliably reflected plaintiff's actual limitations. Finally, as defendant and the ALJ noted,

26  plaintiff's statements concerning his drug and alcohol use were inconsistent. In February 2005,

1   when plaintiff was examined by Dr. Kalman, he denied drug or alcohol use.  When he was

2   examined by Dr. Thurstone in December 2005, plaintiff denied drug use and only admitted to

3   limited alcohol use "now and then."  However, VA records from September 2005 and September

4   2006 reflect continuous marijuana use.

5           **D.      Hypothetical Questions**

6                   Hypothetical questions posed to a vocational expert must set out all the

7   substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

8   Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

9   limitations, the expert's testimony as to jobs in the national economy the claimant can perform

10  has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

11  the ALJ may pose to the expert a range of hypothetical questions, based on alternate

12  interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

13  determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

14  Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

15                  Plaintiff cites Andrews v. Shalala for the proposition that the ALJ was required to

16  include all of the ten moderate limitations identified by Drs. Gross and Gottschalk in her

17  description to the vocational expert of plaintiff's residual functional capacity.[9]  In Andrews, the

18  evidence established that the plaintiff was moderately limited in the following areas:  (1) ability

19  to interact appropriately with the general public; (2) ability to understand and remember detailed

20  instructions; (3) ability to carry out detailed instructions; (4) ability to work in coordination with

21  others without distraction; (5) ability to respond appropriately to changes in the work setting; and

22  (6) ability to set realistic goals or make plans independently of others.  See 53 F.3d at 1043-44.

23  The court observed that the ALJ's hypothetical questions failed to reflect the plaintiff's moderate

24  limitations in the last two "adaptation categories."  See id. at 1044.  The court conclude that,

25  ────────────────

26          [9]     Plaintiff presents this argument in the context of her arguments concerning the
    ALJ's residual functional capacity assessment.

1   because hypothetical questions must reflect all of the plaintiff's limitations, the omission

2   required a remand.  See id.

3            In this case, the record reflects the following exchange with the vocational expert:

4            Q:      . . . If we assume a person the same age, education, and
         work experience as the claimant, and if we now assume . . . that the person
5        has moderate restrictions of activities of daily living, moderate difficulties
         maintaining social functioning, and moderate difficulties in maintaining
6        concentration, persistence, and pace, would you expect such a person to be
         able to perform any of the claimant's past relevant work?

7
         A:      No.
8
         Q:      And would you expect such a person to be able to perform
9        any other competitive work?

10       A:      No.

11                           * * *

12       Q:      . . . If we again assume a person of the same age, activity,
         and work experience as the claimant, and if we now assume . . . that the
13       person is able to do at least one and [two] step tasks, not requiring
         significant close coordinated interactions with others, is able to adapt to
14       changes in work environment, and needs to work in a non-hazardous
         work, would you anticipate such a person would be able to perform any of
15       the claimant's past relevant work?

16       A:      No.

17       Q:      And would you anticipate that such a person would be able
         to do any other work existing in the national or regional economies?

18       A:      Yes.

19

20  The ALJ relied on the vocational expert's answer to the second hypothetical question – which did

21  not include moderate limitations in activities of daily living, maintaining social functioning,

22  concentration, persistence, and pace – in concluding that plaintiff was not disabled.  Defendant

23  argues that, because the second hypothetical question reflected the ALJ's general finding as to

24  plaintiff's residual functional capacity, the vocational expert's answer is valid.

25  / / /

26  / / /

As discussed above, the ALJ accepted the conclusions of Drs. Kalman, Gross, and Gottschalk.  Dr. Kalman concluded that plaintiff is limited in his ability to relate to and interact with supervisors and coworkers, deal with the public, maintain concentration and attention, and withstand the pressures and stress of daily work activities.  Drs. Gross and Gottschalk concluded that plaintiff is moderately limited in his ability to respond appropriately to changes in the work setting.  The ALJ's second hypothetical question assumed that plaintiff is "able to adapt to changes in work environment" and his first hypothetical question was silent in this regard.  However, Dr. Kalman concluded that plaintiff is limited in his ability to withstand work pressures and Drs. Gross and Gottschalk concluded that plaintiff is moderately limited in his ability to respond appropriately to changes in the work setting.  Because neither of the ALJ's hypothetical questions contained this limitation, the vocational expert's responses have no evidentiary value.

Further, the second hypothetical question did not reflect other moderate limitations as to which both Drs. Gross and Gottschalk agree.  Specifically, the ALJ did not ask the vocational expert to consider a person who was moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and accept instructions and respond appropriately to criticism.  Nor did the ALJ ask about a person with limited ability to maintain attention and concentration for extended periods, a limitation Drs. Kalman, Gross, and Gottschalk all agree applies to plaintiff.  The ALJ erred in relying in the vocational expert's response to a hypothetical question which did not include these additional limitations.

/ / /

/ / /

/ / /

/ / /

/ / /

## V.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above.  The court rejects plaintiff's argument that this case should be remanded for the immediate payment of benefits.  First, the ALJ must either include the four limitations identified by Drs. Kalman, Gross, and Gottschalk in her residual functional capacity finding, or provide reasons for not doing so.  This court cannot substitute its own judgment in this regard for that of the agency.  Second, the ALJ must pose to a vocational expert hypothetical questions reflecting all of the limitations ultimately found to apply to plaintiff.

Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment (Doc. 16) is granted;

2.      The Commissioner's cross motion for summary judgment (Doc. 17) is denied;

3.      This matter is remanded for further proceedings consistent with this order; and

4.      The Clerk of the Court is directed to enter judgment and close this file.

DATED: November 20, 2008

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE